UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ASHLEY A. JAMES, | ) |
|                    Plaintiff, | ) No. 13 CV 2210 |
| v. | ) Magistrate Judge Young B. Kim |
| CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration, | ) |
|                    Defendant. | ) January 20, 2016 |

## MEMORANDUM OPINION AND ORDER

Ashley James applied for Supplemental Security Income ("SSI") based on her claim that she is disabled by a combination of asthma, depression, and bipolar disorder. After the Commissioner of the Social Security Administration ("SSA") denied her application, James filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross motions for summary judgment. For the following reasons, James's motion for summary judgment is granted, the government's is denied, and the matter is remanded for further proceedings:

### Procedural History

On July 30, 2002, James's mother filed an application for SSI on behalf of James when she was a minor. (Administrative Record ("A.R.") 116-20.) The Commissioner found that James was disabled with an onset date of October 1, 2003, based on her affective mood disorder, conduct disorder, and asthma. (Id. at 44-45.) James then received SSI benefits as a disabled child for about four years. On June

8, 2007, the SSA informed James that it no longer considered her disabled as of the month after she turned 18 years old. (Id. at 48, 89-92.) As a result, her SSI benefits discontinued as of September 2007. (Id.) When the benefit termination decision was upheld upon reconsideration, (id. at 13-15), James sought and was granted a hearing before an administrative law judge ("ALJ"), (id.).

The hearing took place in October 2009, but the ALJ's decision did not go in James's way. (Id. at 16.) However, the Appeals Council subsequently remanded the matter to a different ALJ for another look. (Id.) On remand, the presiding ALJ scheduled a hearing to take place on October 18, 2011. (Id.) James herself did not appear at the hearing but her attorney did, along with a Vocational Expert ("VE"). (Id.) The ALJ issued a decision a month later finding that James's disability ended on June 1, 2007. (Id. at 13, 26.) When the Appeals Council denied James's request for review, the ALJ's denial of benefits became the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). James filed this lawsuit seeking judicial review of the Commissioner's decision, (R. 1); *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R. 6); *see* 28 U.S.C. § 636(c).

**Facts**

James was 22 years old at the time of the ALJ's 2011 decision denying her SSI benefits. She has a high-school education and does not have any past relevant work experience. James seeks SSI based on her claim that her asthma, depression, and bipolar disorder render her unable to work. At her hearing before the ALJ,

2

James's attorney submitted documentary evidence in support of her claim, but because she was absent at the hearing, she was unable to provide testimonial evidence.

**A.     Medical Evidence**

During a consultative examination on February 13, 2008, Dr. M.S. Patil noted that James has been suffering from asthma for many years and that her asthma is triggered if she is around animals, dust, or people wearing strong perfumes. (A.R. 594.) James reported to Dr. Patil that she has frequent asthma attacks lasting from 30 minutes to sometimes 24 hours, as many as three to four times a week. (Id.) According to Dr. Patil's report, James was hospitalized for asthma three times as a child. (Id.) Dr. Patil examined James and found no deformity of her chest and lungs. (Id. at 595-96.) Although his diagnostic impression was chronic bronchial asthma, he noted that James's lungs were clear. (Id.) Dr. Patil also noted that James's mental activity was normal. (Id. at 597.)

From 2008 through 2011, James frequently sought emergency room treatment for her asthma. In August 2008 James visited an emergency room for an exacerbation of asthma after she was unable to administer her asthma treatments at home because of a power outage. (Id. at 724-32.) Once treated at the ER, she was released with improved condition and with no pain indicated. (Id. at 726.) Two months later James returned to the emergency room for bilateral chest pain and shortness of breath. (Id. at 748.) However, her patient report log shows that her lungs were clear and normal. (Id. at 758.) In February 2009 James again returned

to the emergency room, this time for an upper respiratory infection that aggravated her asthma. (Id. at 739.) Upon examination, she was found to be wheezing but was not otherwise suffering from respiratory distress. (Id.) She was discharged and instructed to take her prescribed medication for asthma. (Id. at 741.)

In 2010 James visited the emergency room 11 times. (Id. at 680-705, 832-995.) Records from those visits show that James had normal x-rays with no abnormalities and was always discharged the same day she came in. (Id.) In July 2010 James visited the emergency room for strep and acute asthmatic bronchitis. (Id. at 932.) Once again her chest x-ray did not show any abnormality. (Id. at 940.)

With regard to her mental impairments, Dr. John Jones of the Bureau of Disability Determination Services ("DDS") completed a psychiatric evaluation of James on April 8, 2008. (Id. at 603-06.) Dr. Jones diagnosed James with depression, tensed psychomotor activity, paranoia, hallucinations, and inadequate impulse control. (Id. 604-05.) He also diagnosed James with moderate bipolar disorder and a history of alcohol abuse as a teenager, but found that she does not present symptoms of a psychotic disorder. (Id. at 606.) At her evaluation, James denied psychiatric hospitalizations. (Id. at 604.)

That same month clinical psychologist L.M. Hudspeth, Psy.D., completed a mental residual functional capacity ("RFC") assessment form for James. (Id. at 615-18.) He did not note any significant limitations in James's evaluation but opined that she would be moderately limited in her ability to understand detailed instructions, maintain concentration, and work in proximity to others without being

4

distracted by them. (Id. at 615.) Furthermore, Dr. Hudspeth noted that James has mixed bipolar disorder but that she retains the capacity to perform unskilled work in a socially limited environment. (Id. at 617.) He also completed a Psychiatric Review Technique Form ("PRTF") where he noted that James had moderate restrictions in her daily living, marked difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace. (Id. at 629.)

On September 28, 2009, Dr. Cynthia Goldman, James's primary care physician, completed an RFC evaluation and diagnosed James with persistent asthma, bipolar disorder, and depression. (Id. at 640-44.) In her RFC, Dr. Goldman noted that James's depression was affecting her physical condition, but that she otherwise would be able to deal with moderate levels of stress and is capable of performing low-stress jobs. (Id. at 641-43.) Dr. Goldman opined that James would miss around four days of work per month because of her physical and mental conditions. (Id.) She also opined that James would require two to three unscheduled breaks in order to accommodate her impairments and that her symptoms would interfere frequently with her ability to maintain attention and concentrate. (Id.)

**B.  Hearing Testimony**

Because James was absent from the hearing, she did not testify. However, the VE testified at the ALJ's request and responded to several hypothetical questions regarding the types of jobs a hypothetical individual with various

limitations can perform. (A.R. 1014-17.) The ALJ first asked what, if any, work a younger individual with a high school education could perform if she can lift and/or carry 50 pounds occasionally and 25 pounds frequently, can sit, stand, or walk for six hours in an eight-hour workday with no more than occasional exposure to dust, fumes, and gases, and with limitations to no more than occasional, brief, and superficial contact with supervisors, co-workers, and the general public. (Id.) The VE answered that such individual would be capable of working various unskilled, medium-exertion jobs, such as a burring-machine operator, motor vehicle assembler, or hand packager. (Id. at 1015-16.)

For the second hypothetical, the ALJ asked the VE whether a person could perform any jobs if she were to miss four days of work a month and would require two to three unscheduled breaks a day lasting 20 to 30 minutes. (Id.) The VE testified that these limitations would not allow the individual to perform any job. (Id. at 1016.) James's representative then asked whether an individual would be able to perform any job if she were off-task 20 percent of the time. The VE opined that this person would also not be able to sustain any employment. (Id.)

**C.    The ALJ's Decision**

On November 18, 2011, the ALJ issued a decision concluding that James is not disabled and therefore not entitled to benefits. (A.R. 13.) The ALJ limited the scope of her review to whether James could be found disabled as of May 2007, when she turned 18. *See* 20 C.F.R. § 416.994. In applying the applicable five-step sequence for assessing disability, *see* 20 C.F.R. § 416.920 (a)(4); *Stepp v. Colvin*, 795

6

F.3d 711, 716 (7th Cir. 2015), the ALJ found that the first step of the rule does not apply to claimants seeking redetermination for SSI benefits at age 18, *see* 20 C.F.R. § 416.987(b); (A.R. 18, 19). At step two, the ALJ concluded that James suffers from severe impairments of asthma and depression. (Id. at 19.) At step three, the ALJ found that James's impairments, alone or in combination, do not meet or medically equal a listed impairment. (Id. at 20-21.) The ALJ then determined that James retains the RFC to perform medium work with some limitations because of her need to be shielded from respiratory irritants. (Id. at 21-24.) At step four, the ALJ found that James does not have any past relevant work. (Id. at 24.) Then at step five, the ALJ concluded that based on the VE's testimony and James's age, education, work experience, and RFC, she is capable of performing jobs existing in significant numbers in the national economy, including burring-machine operator, machine tender, assembler, and packer jobs. (Id. at 25-26.) Accordingly, the ALJ concluded that James is not disabled. (Id. at 26.)

**Analysis**

James argues that the ALJ's decision should be reversed for the following errors: (1) she continued with the hearing without James's attendance; (2) improper credibility determination; (3) improper consideration of James's treating physician's opinion; and (4) faulty step-five determination. This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp*, 795 F.3d at 718 (internal quotation omitted). Under that

7

standard, the court will not substitute its judgment for the ALJ's, reconsider evidence, or reweigh the claimant's credibility. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). At the same time, the court will not "simply rubber-stamp the Commissioner's decision without a critical review of the evidence" and will ensure that the ALJ built a "logical bridge from the evidence" to the conclusion. *Minnick*, 775 F.3d at 935 (internal quotations and citations omitted).

**A.    James's Absence**

James first argues that the ALJ failed to discharge her duty to create a full and fair record because despite being informed that James was ill and was unable to attend the hearing on October 18, 2011, she nonetheless moved forward with the hearing in James's absence and then refused to grant a supplemental hearing. On the day of the hearing James's attorney appeared and advised the ALJ that James had gone to the doctor the day before the hearing to seek treatment for a migraine and asthma issues, and therefore was unable to make it to the hearing. (Id. 1007-08.) The ALJ declined to postpone the hearing and instead accepted documentary evidence from James's attorney and listened to the VE's testimony.

James argues that the ALJ's failure to credit her medical excuse stems from her misreading of the record and that this warrants reversal or a remand. Specifically, James contends that she provided good cause to reschedule the hearing pursuant to 20 C.F.R. § 416.1436, which states in part that "the ALJ will determine good cause exists for changing the time or place of a scheduled hearing if the reason is . . . a serious physical or mental condition or incapacitating injury mak[ing] it

8

impossible . . . to travel to the hearing." In accordance with the relevant procedures for determining good cause, the ALJ informed James's attorney that James could provide medical records to demonstrate why she was unable to appear for her hearing. She explained that a supplemental administrative hearing would be held if good cause was found. On October 24, 2011, James submitted medical records to explain her absence. After reviewing the records, however, the ALJ did not find good cause. Instead, she found that "the treatment records show that James had been short of breath, had a cough, and had been congested for a few days, with no mention of a migraine." (A.R. 17.) The ALJ further determined that "no significant treatment was sought or offered for her alleged shortness of breath, and she received no medication for her headache." (Id.) Because the ALJ did not find good cause for James's absence, she declined to hold a supplemental hearing.

Here, the ALJ adequately explained why none of the evidence James submitted to justify her absence demonstrates a serious illness that made it impossible for her to attend her hearing. *See* 20 C.F.R. § 416.1436. Although James visited Dr. Goldman the day prior to her hearing, the examination record shows that she complained chiefly of a shortness of breath, cough, and congestion, with no reference to any complaint of a migraine. (A.R. 996.) Although Dr. Goldman issued a form signed two days after the hearing to excuse James from the hearing, (Id. at 998), she did not note any restriction that would have prevented James from attending the hearing. Also, James submitted medical records from Community Hospital to the ALJ with a note stating, "please add to file for this

9

postponed hearing," but it is unclear whether these records were submitted to support a good-cause finding. The ALJ noted that the Community Hospital records were from March 2010 through September 2011, with James's last hospital visit taking place a month before the hearing. (Id. at 832-995.) Based on the records that the ALJ cited, substantial evidence supports her conclusion that James lacked good cause to justify her absence at the October 2011 hearing.

## B. Credibility Determination

Next James argues that the ALJ's credibility determination is flawed. She first faults the ALJ for relying on boilerplate language often criticized by the Seventh Circuit as being opaque, meaningless, and unsustainable. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). But the Seventh Circuit has also noted that an ALJ's use of this template is harmless if the ALJ provides additional reasons for her finding. *See Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012). Here, the ALJ pointed to several factors supporting her credibility determination, including the fact that James was attending college to study to be a nurse, that James claimed her absence from the hearing was because of a migraine and an asthma attack but her doctor noted the reason to have been tonsillitis, and because James did not seek psychiatric treatment or counseling for her alleged mental impairments. Because the ALJ offered specific reasons to support her credibility assessment, the use of the boilerplate language is harmless. *See Filus,* 694 F.3d at 868.

James also contends that the ALJ erred when she reasoned that the lack of psychiatric treatments rendered James's allegations of mental impairments not credible. In general, because the ALJ is in the best position to observe witnesses, courts will not disturb credibility determinations as long as they have some support in the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007). But courts have greater freedom to review credibility determinations when those determinations are based on objective factors rather than subjective observations. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). Here, the ALJ discounted James's allegations of depression and bipolar disorder in part because the record showed that she had stopped seeing a psychiatrist when she turned 15 and had received what the ALJ characterized as "little or no counseling or psychiatric treatment" since then. (A.R. 23-24.) But because the ALJ declined to hold a supplemental hearing to take James's testimony, she had no opportunity to ask James why her psychiatric treatment ended. *See Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 788 (7th Cir. 2003) (noting that an ALJ's references to credibility were troubling where claimant did not testify at the hearing). Pursuant to SSR 96–7p, the ALJ "must not draw any inferences" about a claimant's condition unless the ALJ has explored the claimant's explanations as to the lack of medical care, *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008), including for example, the inability to afford treatment or intolerable side effects, *see* SSR 96-7P, 1996 WL 374186, at *7-*8 (July 2, 1996).

11

Because James did not testify at the hearing, the ALJ had no way of knowing whether one of these reasons was behind James's sparse mental-health treatment record. As James points out, the ALJ's willingness to discredit her despite this lack of information in the record raises questions about whether the ALJ met her obligation to fully develop the record to support the credibility assessment. *See Nelms v. Astrue,* 553 F.3d 1093, 1098 (7th Cir. 2009) (citing *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000)) (noting that part of "basic obligation" to develop full and fair record is to thoroughly develop facts). "The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner." *See* SSR 96-7P, 1996 WL 374186, at *7. An ALJ's failure to fulfill her duty to develop the facts provides good cause to remand for gathering of additional evidence. *Smith*, 231 F.3d at 437.

To determine whether an ALJ has discharged her obligation to develop a full and fair record, the Seventh Circuit considers a number of factors: (1) whether the ALJ obtained all of the claimant's medical and treatment records; (2) whether the ALJ elicited detailed testimony from the claimant at the hearing; and (3) whether the ALJ heard testimony from examining or treating physicians. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). Here, the ALJ conducted a 13-minute hearing during which James's attorney provided medical evidence and the VE answered her hypothetical questions. Also during this brief period the ALJ discussed

12

administrative matters with James's attorney, such as how good-cause determinations are made and the process for submitting evidence to show good cause. (A.R. 1007-1013.) The court finds that the ALJ did not develop the record sufficiently to determine why James stopped seeing her psychiatrist and, as such, this observation is insufficient to support the adverse credibility assessment. *See Craft*, 539 F.3d at 679.

In addition to the lack of psychiatric treatment, the ALJ also discredited James's allegations because James was taking courses to become a nurse. The ALJ references Dr. Patil's consultative examination of Plaintiff on February 2008 where the doctor noted that James was then studying at South Suburban College. (A.R. 594.) However, there was no mention of James's studies in Dr. Hudspeth's April 2008 PRTF and in her November 2008 disability report James stated that she had not completed any vocational school or job training. (Id. at 331, 631.) And again, because the ALJ did not take testimony from James, she had no basis to evaluate the intensity, duration, or time commitment involved in James's studies to determine whether those activities are inconsistent with her disability allegations. A claimant's preparations to try to find work do not disqualify her from a disability determination, and because here the ALJ failed to explore the details surrounding James's participation in a nursing program, she had little basis on which to evaluate the consistency between that participation and James's allegations. *See Pierce v. Colvin,* 739 F.3d 1046, 1050-51 (7th Cir. 2014) (noting that claimant's "dogged efforts" to work should not detract from her credibility); *see also McClesky*

*v. Astrue,* 606 F.3d 351, 352 (7th Cir. 2010) (criticizing an ALJ's finding that claimant's semester-long college attendance cast doubt on her disability claim).

Finally, the ALJ found James incredible because James had attributed her absence from the hearing to a "proportionate migraine and asthma," and according to the ALJ, the doctor's letter seeking to excuse James from the hearing only referenced tonsillitis. (A.R. 24.) But the attached physician's note, which is handwritten and cryptic, appears to reference both pain and asthma. (Id. at 997.) Accordingly, it appears that this aspect of the credibility determination rests on a misreading of the record. Although an ALJ is generally in the best position to determine a claimant's truthfulness and forthrightness, *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004), without James's testimony at the hearing, the reasons the ALJ gave in support of the credibility determination are inadequate. On remand the ALJ should contact James to gather additional evidence regarding her lack of medical and psychiatric treatments and about her schooling when assessing how those factors support or detract from her credibility. *See* SSR 96-7P, 1996 WL 374186, at *7 (July 2, 1996).

**C. Treating Physician's Opinions**

James argues that the ALJ erred by rejecting the opinion of her treating physician, Dr. Goldman, without providing a reasoned explanation. The court agrees. The "treating physician" rule directs the ALJ to give controlling weight to the medical opinion of a treating physician if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent

14

with the other substantial evidence." 20 C.F.R. 416.927(d); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). If the treating physician's medical opinion is well-supported and there is no contradictory evidence, there is no basis on which the ALJ could refuse to accept it. *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). However, once contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight. *Id.* At that point, the treating physician's evidence is just one more piece of evidence for the ALJ to weigh, balancing the regulatory factors such as how often the treating physician has examined the claimant and whether the physician is a specialist in treating the condition claimed to be disabling. *Id.* "If the ALJ discounts the physician's opinion after considering these factors, [the court] must allow the decision to stand so long as the ALJ minimally articulate[d] [her] reasons—a very deferential standard." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).

Here, the ALJ did not properly explain why she discredited Dr. Goldman's opinion. The ALJ briefly stated that:

> The claimant's treating physician Dr. Goldman, MD opined in September 2009 that the claimant could stand/walk for two hours in an eight hour workday, occasionally lift 50 pounds, frequently lift 20 pounds and would miss on average four days of work per month. I afford this opinion little weight. This opinion is not supported by treatment records, including Exhibit 34F. Although claimant has asthma exacerbations, they are not of the frequency asserted in this opinion. Further, the record also fails to support Dr. Goldman's reported depressive episodes.

(A.R. 24.) The ALJ's cursory reasoning here fails to build the requisite logical bridge between this conclusion and the record. First, the ALJ references Exhibit

15

34F, which contains James's medical records from Community Hospital. (Id. at 832-995.) Those records show that she was treated in the emergency room for asthma exacerbations on numerous occasions from March 4, 2010, through September 6, 2011. It is difficult to understand how the ALJ could have concluded that James's asthma exacerbations are not of the frequency asserted in the opinion when the exhibit that she references demonstrates that James visited Community Hospital's emergency room six times in 2011 and over eleven times in 2010. (Id. 832-995.) She also had emergency room visits at Advocate Hospital in 2008 and 2009 for her asthma. (Id. at 734-43, 745, 766, 775.) Moreover, her history of mental disorders has been documented by several treating physicians such as Dr. Moolayil, Dr. Patil, and Dr. Hudspeth. (Id. at 591, 597, 617.)

Notably, the ALJ also failed to adequately engage with the regulatory factors dictating how an ALJ must weigh a treating physician's opinion. Once the ALJ declines to give controlling weight to the opinion of a treating physician, she must offer "good reasons" that are "sufficiently specific" in explaining what weight, if any, she assigned it. 20 C.F.R. § 404.1527(d)(2); *Schmidt*, 496 F.3d at 842. If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. *See* 20 C.F.R. § 404.1527(d)(2); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ failed to discuss these factors, including the records showing that Dr. Goldman has

16

been James's primary care provider since October 2007. (A.R. 645-54.) No other treating physician has treated James for as long a period as Dr. Goldman. She saw James for both her mental and physical impairments. (Id. at 645-51, 655-57.) On remand, the ALJ must evaluate what weight to designate to Dr. Goldman's opinions based upon the factors specified in 20 C.F.R. § 404.1527(d)(2). *See Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).

As with the credibility determination, a careful analysis of Dr. Goldman's treating notes and RFC evaluation is essential because it may alter the ALJ's decision at step five. Dr. Goldman opined that James would miss around four days of work monthly due to her physical and mental conditions. (A.R. 641-43.) She also asserted that if James started working, she would require two to three unscheduled breaks in order to accommodate her impairments. (Id. at 643.) Dr. Goldman opined that James's symptoms would frequently interfere with her ability to maintain attention and concentrate on work tasks. (Id. at 641.) The VE testified at the hearing that such limitations would disqualify James from employment. (Id. at 1016-17.) For all of these reasons, the need for a thorough vetting of the weight the ALJ gave Dr. Goldman's opinion is particularly crucial to the overall disability determination in this case.[1]

---

[1] There is no need to address James's step-five argument. The case is remanded for a new credibility assessment and evaluation of Dr. Goldman's opinion. Any change that results from these new assessments will necessarily require a new RFC assessment and a step-five evaluation.

17

## Conclusion

For the foregoing reasons, James's motion for summary judgment is granted, the government's is denied, and the case is remanded for further proceedings consistent with this opinion.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**